UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>CHERIE R. DILLON,<br><br>Defendant. | Case No. 1:16-cr-00037-BLW<br><br>**MEMORANDUM RE ORDER LIQUIDATING EDWARD JONES ACCOUNTS TO SATISFY FORFEITURE JUDGMENT AND FINAL ORDER OF FORFEITURE** |

## INTRODUCTION

On March 9, 2022, this Court conducted a hearing on two matters: (1) the government's Motion for Final Order of Forfeiture Liquidating Fraud Proceeds in Edwards Jones Account or Alternatively for Interlocutory Sale Order of Same (Dkt. 184); and (2) Ken Dillon's Claim of Third Party Interest in Property Subject to the Preliminary Order of Forfeiture (Dkt. 129; Dkt. 185-1). At the hearing, the Court orally denied Ken Dillon's claim. And on March 21, 2022, the Court issued a short, written order granting the government's motion to liquidate a portion of four Edward Jones accounts held by the defendant Cherie Dillon and her husband, Ken Dillon. *See* Dkt. 206. The Court now issues this supplemental memorandum, which further explain the Court's reasons for granting the government's motion.

# PROCEDURAL HISTORY

Cherie Dillon was charged with 24 counts of heath care fraud and 24 counts of aggravated identity theft. She pleaded guilty to all counts after the first week of trial. The Court sentenced her to 60 months' incarceration and ordered forfeiture of $847,016 and restitution of $316,778.25.[1]

As of March 10, 2022, Ms. Dillon had satisfied the restitution award, but $792,058 of the forfeiture judgment remained outstanding. The government sought to satisfy that judgment by liquidating portions of retirement accounts the Dillons maintain with Edward Jones. *See id.* The Court had previously determined that those accounts were forfeitable to the extent they contained proceeds of the admitted fraud scheme or funds directly or indirectly traceable to those proceeds. *See Prelim. Order of Forfeiture,* Dkt. 101, at 2. Additionally, the Court ordered that, upon a proper showing, the government could seek forfeiture of substitute assets under 21 U.S.C. § 853(p). *See id.* at 3.

As for balances of the Edward Jones accounts, the government established that $118,628.81 of fraud proceeds were deposited into each of two IRAs held by the Dillons – for a total of $237,257.62 in deposits. *See* Dkt. 184, at 13; Dkt. 197, at 13; Dkts. 101, 104. Shortly after the Court entered its preliminary order of

---

[1] In August 2020, the government reported that the then-current total restitution and related penalties and surcharges amounted to $342,767.25. *See* Dkt. 179, at 5.

forfeiture, the government moved the Court to: (1) order Edward Jones to liquidate $237,257.62 from the Dillons' IRA accounts at Edward Jones; and (2) then liquate one-half of the remaining balances of all Edward Jones accounts in which Ken or Cherie Dillon had an interest.[2] *See* Dkt. 104, at 2, 6. The combined balance of the two Edward Jones IRA accounts – as of December 31, 2017 – was $545,660.18.

After the government filed its motion to liquidate a portion of the Edward Jones accounts, Cherie Dillon moved to stay enforcement of all monetary orders during the pendency of her appeal. *See* Dkt. 106. In May 2018, the Court denied the motion. *See* Dkt. 133. Nevertheless, the Edward Jones accounts were not liquidated during the pendency of the appeal. And by the time of the March 2022 hearing on this matter, the two IRA accounts had more than doubled in value. Their combined value as of March 7, 2022 was $1,264,480.65.

In August 2021, the government renewed its request to liquidate the Edward Jones retirement accounts, and this time the government asked the Court to utilize a tracing methodology that would result in it receiving a greater share of the IRA accounts. In its renewed request, the government asked the Court to

---

[2] In addition to the two IRA accounts maintained by Edward Jones – the accounts that were the subject of the original motion – Cherie and Ken Dillon also have Roth IRA accounts with Edward Jones. *See* Dkt. 101, at 2.

entirely liquidate the IRA in Cherie Dillon's name and up to 66% of the IRA in Ken Dillon's name – for a total liquidation value of $792,058. *See* Dkt. 184, at 14. For the reasons explained below, in its March 21, 2022 order, the Court granted the motion, to the extent that it directed Edward Jones to liquidate up to $792,058 of the accounts. The court utilized a different tracing methodology than that proposed by the government, however. This memorandum explains why.

## GOVERNING LEGAL STANDARDS

The government is entitled to forfeiture of monies in the Dillons' Edward Jones accounts under 18 U.S.C. § 982(a)(7). Under that section, if a person has been convinced of a health care offense, the sentencing court must order the defendant to forfeit gross proceeds that are traceable to the commission of the offense. Proceeds are defined to include any kind of property that is "obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture" as well as "any property traceable thereto, . . . ." 18 U.S.C. § 981(a)(2)(A).[3] The government has the burden of proving, by a preponderance of the evidence, that forfeiture of the property it seeks is warranted. *See generally United States v. Christensen,* 828 F.3d 763 (9th Cir. 2016). The government can

---

[3] Section 982 further provides that "forfeiture of property under this section ... shall be governed by the provisions of section 413 (other than subsection (d) of that section) of the Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 U.S.C. 853)." 18 U.S.C. § 982(b)(1).

meet that burden through evidence introduced at trial as well as evidence proffered at a hearing on the forfeiture issue. *See* Fed. R. Crim. P. 32.2(b)(1)(B).

More generally, forfeiture is a two-step process. First, the defendant's interests are adjudicated with a preliminary order of forfeiture. Second, any third party interests are adjudicated in an ancillary proceeding. *See* Fed. R. Crim. P. 32.2(b), (c). In an ancillary proceeding, third parties may avoid forfeiture of their interests by satisfying the requirements of 21 U.S.C. § 853(n)(6). In a nutshell, the statutory framework protects two types of third parties: subsequent bona fide purchasers and persons who have a prior or superior legal title in the asset sought to be forfeited. These two types of interests are laid out more specifically in § 853(n)(6), which provides:

> (6)    If, after the hearing, the court determines that the petitioner has established by a preponderance of the evidence that—
>
> (A) the petitioner has a legal right, title, or interest in the property, and such right, title, or interest renders the order of forfeiture invalid in whole or in part because the right, title, or interest was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property under this section; or
>
> (B) the petitioner is a bona fide purchaser for value of the right, title, or interest in the property and was at the time of purchase reasonably without cause to believe that the property was subject to forfeiture under this section;
>
> the court shall amend the order of forfeiture in accordance

with its determination.

21 U.S.C. § 853(n)(6). *See generally United States v. Lazarenko*, 476 F.3d 642, 648 (9th Cir. 2007). A third party petitioner bears the burden of proving his "right, title, or interest under section 853(n)(6)." *United States v. Navo*, 404 F.3d 1119, 1125 (9th Cir. 2005).

## DISCUSSION

Cherie Dillon objected to the liquidation of the Edward Jones accounts primarily on the grounds that the government's motion was premature. At the time the government renewed its motion (in August of 2021), Ms. Dillon's § 2255 motion had not yet been decided. *See generally* 28 U.S.C. § 2255. As of this writing, however, the Court has denied the § 2255 motion and the Ninth Circuit has declined to issue a certificate of appealability. Additionally, the Court explained its reasons for denying Ken Dillon's third-party claim during the hearing. Accordingly, this decision will focus on the propriety of the government's proposed tracing methodology, which the Court declined to adopt.[4]

Because Mr. Dillon failed to establish his third-party claim, we start with the proposition that the government is entitled to forfeiture of all deposited fraud

---

[4] Additionally, many of Ken Dillon's arguments regarding the appropriate tracing methodology were mooted by the Court's adoption of the drugs-in/first-out methodology, described further below. To the extent they were not mooted, however, the Court simply notes that it has carefully considered each of Mr. Dillon's arguments and finds them unavailing.

MEMORANDUM - 6

proceeds – that is the $237,257.62 – *plus* any proceeds generated from those deposits, which would include market appreciation.

This would be a simple matter if the fraud proceeds had been deposited into a separate account. But that is not the case. The fraud proceeds were deposited into accounts containing legitimate funds. And after those proceeds were deposited, the Dillons withdrew funds from the accounts. Additionally, the values of these accounts have appreciated significantly over the past few years. The summary of the relevant account activity and appreciation is shown in this chart (alongside the government's proposed LIBR calculations):

**Cherie Dillon-Edward Jones Account #___3807-___/___9731___**

| | Date | Fraud Deposit | Account Withdrawals | Total Account Balance | LIBR % | LIBR Fraud Balance |
|---|---|---|---|---|---|---|
| | 01/01/2010 | $ - | $ - | | 0% | $ - |
| Year Ended | 12/31/2010 | $ 15,827.81 | $ - | $ 176,234.36 | 9% | $ 15,827.81 |
| Year Ended | 12/31/2011 | $ 35,676.00 | $ - | $ 213,161.02 | 24% | $ 50,779.02 |
| Year Ended | 12/31/2012 | $ 34,782.00 | $ - | $ 281,004.60 | 34% | $ 94,414.23 |
| Year Ended | 12/31/2013 | $ 32,343.00 | $ - | $ 380,867.05 | 40% | $ 153,621.13 |
| Year Ended | 12/31/2014 | $ - | $ 3,000.00 | $ 453,073.94 | 41% | $ 183,955.52 |
| Year Ended | 12/31/2015 | $ - | $ 36,000.00 | $ 394,890.52 | 44% | $ 174,394.89 |
| Year Ended | 12/31/2016 | $ - | $ 36,973.72 | $ 416,983.44 | 49% | $ 202,273.08 |
| | 01/01-4/28/2017 | $ - | $ 27,000.00 | $ 417,295.82 | 52% | $ 215,577.68 |
| | 4/29-5/26/2017 | $ - | $ 136,150.14 | $ 236,064.06 | 81% | $ 192,288.23 |
| | 5/27-6/30/2017 | $ - | $ 50,000.00 | $ 164,069.72 | 100% | $ 164,069.72 |
| | 7/1-8/25/2017 | $ - | $ 29,468.94 | $ 146,767.80 | 100% | $ 146,767.80 |
| | 8/26-12/31/2017 | $ - | $ - | $ 158,992.26 | 100% | $ 158,992.26 |
| Year Ended | 12/31/18 | $ - | $ - | $ 157,305.69 | 100% | $ 157,305.69 |
| Year Ended | 12/31/19 | $ - | $ - | $ 231,476.94 | 100% | $ 231,476.94 |
| Year Ended | 12/31/20 | $ - | $ - | $ 347,211.20 | 100% | $ 347,211.20 |
| | 01/01-2/17/2021 | $ - | $ - | $ 348,684.72 | 100% | $ 348,684.72 |

**Kenneth Dillon-Edward Jones Account #___3808-___/___9732___**

| | Date | Fraud Deposit | Account Withdrawals | Total Account Balance | LIBR % | LIBR Fraud Balance |
|---|---|---|---|---|---|---|
| | 01/01/2010 | $ - | $ - | | 0% | $ - |
| Year Ended | 12/31/2010 | $ 15,827.81 | $ - | $ 145,643.32 | 11% | $ 15,827.81 |
| Year Ended | 12/31/2011 | $ 35,676.00 | $ - | $ 184,484.61 | 28% | $ 51,426.62 |
| Year Ended | 12/31/2012 | $ 34,782.00 | $ - | $ 245,525.23 | 39% | $ 94,529.28 |
| Year Ended | 12/31/2013 | $ 32,343.00 | $ - | $ 334,466.67 | 45% | $ 152,037.95 |
| Year Ended | 12/31/2014 | $ - | $ 12,000.00 | $ 384,122.18 | 47% | $ 180,128.03 |
| Year Ended | 12/31/2015 | $ - | $ 33,000.00 | $ 336,984.49 | 51% | $ 172,924.43 |
| Year Ended | 12/31/2016 | $ - | $ 36,974.16 | $ 345,455.21 | 57% | $ 198,258.21 |
| Year Ended | 12/31/2017 | $ - | $ 52,000.00 | $ 386,668.62 | 66% | $ 257,008.80 |
| Year Ended | 12/31/2018 | $ - | $ - | $ 386,832.71 | 66% | $ 257,117.87 |
| Year Ended | 12/31/2019 | $ - | $ - | $ 506,484.37 | 66% | $ 336,647.29 |
| Year Ended | 12/31/2020 | $ - | $ - | $ 646,526.80 | 66% | $ 429,729.93 |
| | 01/01-2/17/2021 | $ - | $ - | $ 656,383.70 | 66% | $ 436,281.56 |

In these situations, the question is whether – given the fungibility of money – the government can satisfy its burden of showing by a preponderance that the fraud proceeds can be "traced" into the account within the meaning of the relevant asset-forfeiture statute.

Broadly, courts confronting this issue are divided over whether tracing can occur when legitimate funds have been commingled with tainted funds. *See generally* Welsh, Sean Michael, *Tracing Commingled Funds in Asset Forfeiture,* 88 Miss. L.J. 179, 206 (2019). The Ninth Circuit has not definitively spoken on the issue in the criminal asset-forfeiture context, although in *United States v. Laykin,* 886 F.2d 1534, 1541 (9th Cir. 1989), the Ninth Circuit generally stated that "when tainted and untainted funds are commingled in an account, and withdrawals are subsequently made, a proportionate share of those withdrawals will be allocated to the tainted funds." In making this statement, the Ninth Circuit cited one of the leading cases on the subject – the Second Circuit's decision in *United States v. Banco Cafetero Panama*, 797 F.2d 1154 (2d Cir. 1986).

In *Banco Cafetero*, the government brought a forfeiture action under the civil forfeiture statute – 21 U.S.C. § 881(a)(6) – seeking to obtain $3 million in various bank accounts. The government said it had probable cause to believe the funds in the accounts derived from a criminal drug conspiracy and, further, that the funds were "proceeds traceable" to narcotics transactions. *See* 21 U.S.C.

§ 881(a)(6). The defendants argued that, based on the fungibility of money, the government could not trace specific dollars into the accounts, and, therefore, the accounts were insulated from forfeiture. 797 F.2d at 1158.

The Second Circuit rejected defendants' argument and laid out three optional tracing methodologies:

(1) **The LIBR Rule.** The first option is known as the "lowest intermediate balance" rule (LIBR), or the so-called "drugs-in, last-out" rule. *Id.* at 1159. As that name suggests, this rule assumes that when commingled funds are in an account, legitimate funds are withdrawn first – leaving the tainted funds in the account.

(2) **The Pro Rata Rule.** A second approach is called the pro rata, or averaging, rule. This rule is best explained with an example: Assume that an account with a balance of $2,000 contains $1,000 in legitimate funds and $1,000 in tainted funds. If the account holder withdraws $1,000, then that withdrawal would be split 50/50, as that was the ratio of legitimate versus tainted funds in the account before the withdrawal. The net result would be that of the $1,000 remaining in the account, $500 would be considered tainted funds and $500 would be considered legitimate. *Id.*

(3) **"Drugs-In, First-Out" Rule.** The third approach has been referred to as a "drugs-in, first-out" rule. As the name suggests, this rule posits that when withdrawals are made, tainted money leaves the account first.  *Id.*

The *Banco Cafetero* Court held that the government could choose, at its option, either the first or third approach. *Id.* at 1159.[5] The court explained that the

---

[5] In *Banco Cafetero*, the government did not argue for an "averaging" approach to
(Continued)

government only had to demonstrate probable cause to forfeit the money in the accounts: "In almost all cases, once the Government has shown probable cause to believe that a person has sold drugs and has deposited the proceeds of a drug sale into a bank account, there will be probable cause to believe that the bank account contains 'traceable proceeds' of the sale (if the balance has not fallen below the amount of the deposit) *and* probable cause to believe that a withdrawal contains such 'traceable proceeds' (if the withdrawal exceeds the deposit)." *Id.* at 1160-61.

Here – despite the fact that its burden is to demonstrate traceability by a preponderance of the evidence – the government argues that LIBR is the "preferred" or "prevailing" methodology and urges the Court to apply it here. *See Motion,* Dkt. 184, at 10 (citing *United States v. $56,471,329.88 in Proceeds From the Sale of a Bond Belonging to Airbus SE,* 466 F. Supp. 3d 63, 66 (D.D.C. 2020)). The problem, however, is that although district courts in the Ninth Circuit have followed *Banco Cafetero,*[6] the Ninth Circuit has not expressly adopted

---

tracing, so the Second Circuit did not consider whether that option was available to the government. 797 F.2d at 1159 n.6.

[6] These district courts within the Ninth Circuit that have expressly adopted (or at least indicated approval of) *Banco Cafetero: United States v. Haleamau*, 887 F. Supp. 2d 1051, 1056-57 (D. Haw. 2012); *United States v. $3,148,884.40 U.S. Currency*, 76 F. Supp. 2d 1063, 1066-69 (C.D. Cal. 1999); *United States v. Lindell*, No. 13-00512, 2016 WL 4707976, at *5 (D. Haw. Sept. 8, 2016); *United States v. 2009 Dodge Challenger*, No. 03:11-cv-328-MA, 2011 WL 6000790 at *2 (D. Or. Nov. 30, 2011); *United States v. Real Prop. Located at 6415 N. Harrison Ave.*, No. 1:11-CV-00304-WW-SKO, 2011 WL 2580335 at *3-4 (E.D. Cal. June 28, 2011).

LIBR (or any approach discussed in *Banco Cafetero*) in the criminal asset-

forfeiture context. *See generally* Welsh, 88 Miss. L.J. at 205-06, 208.

As noted above, in *United States v. Laykin,* 886 F.2d 1534, 1541 (9th Cir.

1989), the Ninth Circuit generally suggested that the pro rata approach from

*Banco Cafetero* is an appropriate tracing methodology. But *Laykin* is only useful

to a point because it isn't a forfeiture case. Rather, in *Laykin*, the Ninth Circuit

was called upon to decide if the evidence at trial supported the defendants'

convictions for equity skimming.[7] The defendants challenged their convictions,

arguing that it was impossible to tell whether they had committed equity

skimming because the account from which they had allegedly wrongfully

withdrew money contained both untainted and tainted (i.e., "skimmed") funds.

The Ninth Circuit rejected the argument, explaining:

> [W]e do not think the gap in the record renders the convictions
> invalid. Generally, when tainted and untainted funds are
> commingled in an account, and withdrawals are subsequently
> made, a proportionate share of those withdrawals will be allocated
> to the tainted funds. *See Restatement (Second) of Trusts* § 202(1),
> comment i (1959) (commingling by trustee of trust and personal
> funds); *see generally United States v. Banco Cafetero Panama*,
> 797 F.2d 1154, 1159-60 (2d Cir.1986) (tracing proceeds from
> narcotics transactions). . . . [Defendants] were essentially trustees
> of the rental payments from the properties set forth in the
> indictment. We believe that the Restatement allocation rule is an
> appropriate one to apply here. Accordingly, from the evidence

---

[7] Equity skimming is prohibited by 12 U.S.C. § 1709-2.

> presented by the government, the jury could reasonably conclude
> that at least part of the monies the appellants received from the
> commingled account came from the rental payments on the
> federally-insured properties.

*Id.* at 1541.

The Court is not persuaded that this brief invocation of *Banco Cafetero*

means the issue has been decided as it relates to a criminal forfeiture proceeding.

That is still an open question in the Ninth Circuit, and *Banco Cafetero* has been

rejected by three other circuits (the Third, Fifth, and Eleventh) that have

addressed the issue in the context of criminal forfeiture proceedings.

In the first of these cases – *United States v. Voigt,* 89 F.3d 1050 (3d Cir.

1996) – the Third Circuit expressly rejected *Banco Cafetero,* explaining that

"once a defendant has commingled laundered funds with untainted funds –

whether in a bank account or a tattered suitcase – such that they 'cannot be

divided without difficulty,' . . . the government must satisfy its forfeiture

judgment through the substitute asset provision." *Id.* at 1088. The substitute-

assets provision – laid out in 21 U.S.C. § 853(p) – allows the government to

forfeit any of the defendant's property if the defendant has (1) commingled

property that otherwise forfeitable under § 853(a); and (2) the forfeitable property

"cannot be divided without difficulty." 21 U.S.C. § 853(p); *see generally United*

*States v. Ripinsky*, 20 F.3d 359, 365 n.8 (9th Cir. 1994) ("§ 982 [the criminal

forfeiture statute] ... defines forfeitable assets to be only those associated with the

underlying offense or traceable to the offense and distinguishes between
'forfeitable' and 'substitute' assets.").

Three years later, in *United States v. Stewart,* 185 F.3d 112 (3d Cir. 1999),
the Third Circuit walked back *Voigt* somewhat. In *Stewart,* the court held that
when tainted funds were deposited into an account containing legitimate funds –
and, critically, no substantial intervening withdrawals or deposits occurred – the
government was able to trace the illegitimate funds to the defendants' account.
The central teaching of *Stewart* is that if an account remains static, and tracing is
relatively easy, the government may be able to trace tainted funds that have been
commingled with legitimate funds.

More recently, the Fifth and Eleventh Circuits adopted the Third Circuit's
approach as outlined in *Voigt* and *Stewart.*

The Fifth Circuit confronted the commingling/tracing issue in *United
States v. Ayika,* 837 F.3d 460 (5th Cir. 2016). *Ayika* is particularly useful here, as
it involves a healthcare fraud conviction and thus wrestles with the same
forfeiture statute before the Court – 18 U.S.C. § 982(a)(7) – as well as the
substitute-assets provision, 21 U.S.C. § 853(p).

The bank account at issue in *Ayika* had a high volume of transactions –
over 12,000 – and a wide mix of tainted and untainted funds. Under these facts,
the court held tracing was not possible and that the government would need to

rely upon the substitute-assets provision found in 21 U.S.C. § 853(p). *See id.* at

475-76. *Ayika* further observed that while no court had yet addressed traceability

in the context of health care fraud proceeds, the few courts that had "fully

addressed" the issue in other contexts had "noted its difficulty, if not

impossibility." *Id.* at 472.[8]   The court explained that it agreed with the Third

Circuit's approach, as outlined in *Voigt* and *Stewart*:

> Like *Voigt*, we read the plain language and requirements of
> tracing under § 982(a)(7), just as § 982(a)(1),[[9]] to be
> demanding for establishing forfeiture, particularly as it relates
> to fungible assets. But, like *Stewart*, we agree that when the
> balance of a commingled, but largely static, account is sought
> for forfeiture, traceability under § 982(a)(7) can be possible.

837 F.3d at 474.

    In *Rothenstein, Rosenfeldt, Adler, P.A. v. Rothstein*, 717 F.3d 1205 (11th

---

[8] *Ayika* footnote cited these authorities, which also deal with tracing in healthcare fraud cases: *United States v. Louthian,* 2013 WL 594232, at *4 (W.D. Va. Feb. 15, 2013), *aff'd*, 756 F.3d 295 (4th Cir. 2014) ("Where fraudulently obtained funds are commingled with legitimately obtained funds, and additional withdrawals and deposits are made from and to the same account, the government likely cannot meet its burden of showing which funds are traceable to the [healthcare] fraud and which are not."); *United States v. Poulin,* 690 F.Supp.2d 415, 428-29 (E.D. Va. 2010), *aff'd*, 461 Fed. Appx. 272 (4th Cir. 2012) (holding that if assets derived illegally under 18 U.S.C. § 982(a)(7) are deposited "into an account that also contains legitimate receipts, and thereafter [the defendant] makes several withdrawals and additional deposits, the government will likely have a difficult time showing which money is 'traceable' to the fraud").

[9] Retracing our earlier steps, 18 U.S.C. § 982(a)(7) is the forfeiture statute at issue here and it was the statute at issue in *Ayika.* Subdivision 982(a)(1) – which contains similar language regarding traceability – was at issue in in *Voigt*.

Cir. 2013), the Eleventh Circuit adopted the Third Circuit's approach. *Rothenstein* involved commingling of legitimate and illegitimate funds over several years. The court held that "the sheer volume of volume of financial information available and required to separate tainted from untainted monies in this case leads us to the conclusion that it is far more appropriate to apply the Third Circuit's rule in *Voigt* than the exception to that rule it lays out in *Stewart*." *Id.* at 1213.

Responding to this line of authority, the government generally argued during the hearing that the courts rejecting the LIBR tracing methodology are outliers. The government also generally argues that, as a policy matter, it should be allowed the flexibility to choose from the tracing methodologies outlined in *Banco Cafetero,* lest criminals get away with their ill-gotten gains. More specifically, the government argues that the *Voigt* line of cases does not take later legislative history into account. Also, the government directs the Court's attention to *United States v. Check No. 25128 in Amount of $58,654.11*, 122 F.3d 1263 (9th Cir. 1997).

The Court will address each of these arguments. First, the Court respectfully disagrees that the circuit decisions described above are outliers; the Court sees these cases as reflective of an emerging circuit trend away from *Banco Cafetero.*

Second, as already noted above, the Court is not inclined to adopt a policy approach that, in its view, runs counter to statutory language regarding traceability – not to mention the overall statutory scheme that contemplates that the substitute-assets provision will be used when commingling makes it difficult to trace tainted funds.

Third, regarding the argument that later, legislative history undercuts the *Voigt* decision, the Court is not persuaded. Here, the government points to the legislative history of 18 U.S.C. § 984. That section deals with civil forfeitures – not criminal forfeitures. There is not a substitute-assets provision applicable in civil asset-forfeiture cases.

And as for *United States v. Check No. 25128 in Amount of $58,654.11*, 122 F.3d 1263 (9th Cir. 1997), this case ultimately does not shed much light on the issues before the Court. In that case, the Fairbanks police, responding to a domestic violence case, went to Perry Johnson's home and, while looking for victims, saw drugs and drug paraphernalia. They obtained a search warrant and found $44,850 cash, which they seized and turned over to the DEA. The DEA began forfeiture proceedings, which Johnson did not contest, and the DEA eventually turned over a portion of the forfeited cash to the City of Fairbanks.

Meanwhile, in Alaska state court, Johnson successfully moved to suppress the evidence seized by the warrant. The state dismissed the charges against him,

and when the City refused to return the cash, Johnson sued for conversion and won. The City issued him a check for $58,645.11. The United States seized the check and began the civil forfeiture process. The district court granted summary judgment in favor of the United States.

On appeal, Johnson argued that the $58,645.11 check seized by the government did not represent the proceeds of a drug transaction. He said the check constituted the proceeds of his conversion lawsuit against the City of Fairbanks. The Ninth Circuit rejected this argument, citing to *Banco Cafetero* in the process:

> The fact is that the check is both the proceeds of the suit and the proceeds of drug transactions. Johnson would like us to stop at the suit. Unfortunately for him the [civil forfeiture] statute tells us that we should go on to what is "traceable" to drug transactions, 21 U.S.C. § 881(a)(6). *The tracing is easy*. What Johnson got in his civil suit was an amount representing the recovery of the cash hoard from his drug deals. Tracing of money does not require that the identical money be traced. Just as a credit in a bank account may be found to represent the cash proceeds from a sale of drugs, *United States v. Banco Cafetero Panama*, 797 F.2d 1154, 1158 (2nd Cir. 1986), so the civil judgment here is the traceable form that Johnson's drug cash took.

*Id.* at 1264 (emphasis added).

It's hard to know what to make of *Check No. 25128* in terms of deciding whether the Ninth Circuit would embrace the various tracing methodologies outlined in *Banco Cafetero.* To be sure, the court approvingly cited *Banco*

*Cafetero.* But, on the other hand, the case is easily distinguishable from the facts before the Court.

First, the fact pattern in *Check No. 25128* did not involve commingling of tainted and untainted funds in a single account – combined with various subsequent withdrawals – such that tracing became difficult. Indeed, as noted in the block quote above, the Ninth Circuit expressly stated that the tracing in that case was "easy." So in that sense, the *Check No. 25128* decision is consistent with the Third Circuit's decision in *United States v. Stewart,* 185 F.3d 112 (3d Cir. 1999). And as already noted, the Third Circuit has essentially rejected *Banco Cafetero,* except in cases where tracing is easy. *See, e.g., United States v. Voigt*, 89 F.3d 1050 (3d Cir. 1996).

Second, *Check No. 25128* is a civil asset-forfeiture case, so the Ninth Circuit was not called upon to wrestle with the substitute-assets provision available to the government in criminal forfeiture proceedings.

Third, the government's burden in this case is the preponderance-of-the-evidence standard, whereas in *Check No. 25128,* the government simply had to establish probable cause.

Finally, it is notable that despite some fairly thorough, recent decisions from other circuits, none pointed to *Check No. 25128* (or *Laykin,* for that matter) as laying out the Ninth Circuit's approach to tracing funds in accounts containing

tainted and untainted funds. Likewise, a comprehensive law journal article on the topic does not mention *Check No. 25128,* and otherwise says the Ninth Circuit has not yet decided the issue. *See* Welsh, Sean Michael, *Tracing Commingled Funds in Asset Forfeiture,* 88 Miss. L.J. 179, 206 (2019).

For all these reasons, the Court concludes that the Ninth Circuit has not adopted *Banco Cafetero* as an appropriate tracing methodology in all criminal forfeiture cases. Thus, the Court rejects the notion that the government is always entitled to choose from the tracing methodologies set forth in *Banco Cafetero*. As a policy matter, the Court might be inclined to adopt this approach. But the fact remains that the governing statute says forfeitable property must be "traceable to the commission of the offense." 18 U.S.C. § 982(a)(7). Additionally, the statutory scheme contemplates that the substitute-assets provision "shall apply" if the defendant commingled tainted and untainted funds such that the resulting, commingled pool of money cannot be divided without difficulty. *See* 21 U.S.C. § 853(p)(1)(E). The Court will take Congress at its word. As the Third Circuit put it in *Voigt*, "we should not be in the business of overlooking the plain terms of a statute in order to implement what we, as federal judges, believe might be better policy." 89 F.3d at 1085.

In this case, the third methodology discussed in *Banco Cafetero* – the so-called "drugs-in/first-out" approach – is the only methodology that will allow the

Court to determine with certainty that fraud proceeds remain in one of the Edward Jones accounts. The Court will explain how this tracing methodology applies to the that account below.

First, though, the Court will give a simple example to illustrate why this approach conforms with the statutory command to forfeit property that is "traceable" to the offense: Assume a person deposits $50 of health-care fraud proceeds into an account containing $50 of innocent funds and then later withdraws $25. Because money is fungible, it is impossible to say whether that later, $25 withdrawal represents fraud proceeds or innocent money. But you can say – with certainty – that at least $25 of the $75 remaining in the account represents fraud proceeds. In that scenario, the Court could therefore determine that $25 is traceable to the commission of the offense, and the government would be entitled to that $25 under 18 U.S.C. § 982(a)(7).

Applying that approach here, during the March 10, 2022 hearing, the government's expert testified that even though Ken Dillon made various withdrawals *after* fraud proceeds were deposited into his IRA, 34% (or $222,661.57) of the balance of his IRA account represents fraud proceeds. *See also* Dkt. 202, at 9.

Because the withdrawals from the IRA in Cherie Dillon's name were more substantial – exceeding the amount of the fraud deposits – it is not possible to say

that any of the amounts remaining in that account are fraud proceeds. Accordingly, the government will need to resort to the substitute-assets provision to forfeit Cherie Dillon's marital half of that account.

In keeping with this approach, the Court's March 21, 2022 order directs Edward Jones to liquidate 34% of the IRA in Ken Dillon's name. After that, the government was authorized, under 21 U.S.C. § 835(p), to liquidate half of the balances in the remaining Edward Jones accounts until the forfeiture judgment is satisfied.

Finally, the Court will observe that these cases are necessarily fact-intensive. In each case involving commingled funds, a court will need to carefully examine the accounts at issue, alongside any relevant deposits and withdrawals. It may well be that in another factual setting, it would be appropriate to allow the government to utilize the LIBR tracing methodology laid out in *Banco Cafetero*. But given the facts of this case, the Court cannot conclude that LIBR is an appropriate tracing methodology in this particular instance for the reasons explained above.

## ORDER

Accordingly, **IT IS ORDERERED that** the Court's March 21, 2022

Order shall stand as the Order of this Court, as supplemented by this

Memorandum.

DATED: June 10, 2022

B. Lynn Winmill
U.S. District Court Judge